ORIGINAL

ericaponik5k

LEONARDO M. RAPADAS
United States Attorney
KARON V. JOHNSON
Assistant U.S. Attorney
Suite 500, Sirena Plaza
108 Hernan Cortez Avenue
Hagatna, Guam 96910
Telephone: (671) 472-7332
Telecopier: (671) 472-7334

FILED
DISTRICT COURT OF GUAM
SEP 29 2006
MARY L.M. MORAN
CLERK OF COURT

Attorneys for the United States of America

IN THE UNITED STATES DISTRICT COURT

FOR THE TERRITORY OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>ERIC M. APONIK,<br><br>    Defendant. | CRIMINAL CASE NO. 05-00053<br><br>**UNITED STATES RESPONSE TO DEFENDANT'S RESPONSE TO PRESENTENCE REPORT** |

    Defendant's objections to the presentence report are not well founded. The report fails to include the lengthy and detailed testimony and documentary evidence adduced against Aponik during the trial of his brother-in-law, Brian Elm. The testimony establishes that by the time of his arrest June 18, 2005, defendant was the leader and organizer of this drug ring.

    Following is a brief summary of the Elm trial testimony. Albert Mendiola, Jonathan Canovas and Christopher Espinosa are natives of Guam who had moved to Las Vegas. They were related to, acquainted with, or former school mates of Brian Elm, Chris Iager and John Cruz. At trial, Mendiola testified that in 2003, he began shipping ice to Guam, to be distributed by Iager, a friend of Brian Elm's. Mendiola testified that as time progressed, he took on a partner in Las Vegas, Canovas, who financed purchases of ice for profit. Mendiola would mail greeting

-1-

cards containing 3-5 grams each to Iager's post office box. Defendant was using ice during that time, 2003-early 2004, which he received from Brian Elm. He believed this ice came from Iager.

Sometime in late summer, 2004, before the school term began in Las Vegas, several of these individuals were on island attending a bar-b-que at Aponik's residence. Canovas testified that during the party Brian Elm approached him about sending ice directly to him for distribution. When Canovas returned to Las Vegas he began buying ice directly from Mendiola's source and mailing it to Elm's post office box. He gave Elm his Bank of Guam savings account number, which was in his and his mother's name, and instructed Elm to deposit his share of the proceeds into that account. Canovas identified the exact date he received his first payment, October 13, 2004. A summary of his bank records were admitted at trial.

Defendant testified that in late 2004, he was repairing a warehouse belonging to the family business, and hired Brian Elm to help him. He testified that when he picked up Elm one day, the Elm asked him to stop at the Bank of Guam in Mangilao so he could make a deposit. Elm told defendant he was selling ice for Canovas, and depositing the proceeds into Canovas' account. Defendant testified that Elm was concerned that bank tellers would get suspicious if the same person made cash deposits frequently, so defendant agreed to make deposits also. Defendant identified the next deposit for Canovas, $800 on November 6, 2004, as one he made on behalf of Brian Elm.

Brian Elm eventually asked the defendant to open a post office box for the receipt of Canovas' shipments, because Elm shared his own post office box with his girlfriend. Aponik opened the box November 18, 2004, and from that time forward, all the Las Vegas ice was sent there. The telephone toll records concerning Aponik, Brian Elm and Canovas reflect dozens of calls between them.

Brian Elm was both distributing ice himself and through other individuals. John Cruz, a mid-level dealer with about 20 customers of his own, testified he had been purchasing ice from

-2-

Elm almost daily, for $450/gram. The cell phone records between Cruz and Brian Elm reflect many daily calls between the two men during late 2004 and early 2005. Jarett Elm, Brian's cousin, received ice from him on many occasions. Jarett Elm testified that he had never used ice until one day in late 2004, when he went to defendant's warehouse to visit and found defendant and Brian Elm smoking ice. Brian offered Jarett a hit, and he was hooked. He never observed either defendant or Brian Elm distributing to others, but he testified to one occasion, when he walked into the warehouse and saw defendant and Brian sitting at a table with a load of ice and a scale.

(Note: by November, 2004, Albert Mendiola was no longer associated with Canovas, and had had a falling out with Iager. Mendiola was using his brother Paul as the recipient for his ice shipments. Both have been convicted for a shipment sent to Paul in February, 2005, Cr. No. 05-00011.)

By late December, 2004, Canovas' friend, Espinosa, had started financing the shipments, which were increasing in size. The method of returning proceeds had changed as well. Canovas was concerned that his mother would become suspicious of large amounts moving through his savings account, so he instructed Brian Elm and defendant to begin wiring money via Western Union as well. The first wire transfer of drug proceeds was made by defendant to Canovas and Espinosa on January 2, and 3, 2005, respectively. Each man received $3,000.

Brian Elm, who was on probation to the Superior Court of Guam, was ordered to serve a jail sentence beginning March 18, 2005. Cruz testified that Brian Elm told him he would be going to jail, and that Cruz should begin dealing directly with defendant, who had agreed to resume control of the organization. Defendant testified that after Elm went to jail, he assumed responsibility for the operation, and Brian Elm had nothing further to do with it. Defendant assumed control over ordering the ice Espinosa was sending to Guam, distributing it, and sending Espinosa his share of the proceeds. This was the situation when defendant and Jarett Elm were arrested June 18, 2005, attempting to pick up a package containing 114 grams of ice mailed by

Espinosa.

Defendant's two-level enhancement as a supervisor is entirely deserved. By June, 2005, he controlled this organization, ordering ice from Espinosa, employing John Cruz to distribute it, and causing Jarett Elm to wire proceeds back to Espinosa.

Whether defendant should receive this enhancement is determined by the court, using a preponderance of the evidence standard. United States v. Staten, 450 F.3d 384 (9th Cir. 2006) requires a higher burden of proof–clear and convincing evidence–when an enhancement has an extremely disproportionate effect on the advisory guideline range. In Staten, however, the defendant was facing a offense level of 12, and an enhancement of an additional 15 levels for operating a meth lab which arguably represented a substantial risk to human life and the environment. The two-level enhancement defendant faces here for role in the offense, or the resulting four-level disparity because he is not entitled to the safety valve, is not so extremely disproportionate as to require the higher burden of proof.

Respectfully submitted this __29th__ day of September, 2006.

LEONARDO M. RAPADAS
United States Attorney
Districts of Guam and NMI

By: *(signature)*
KARON V. JOHNSON
Assistant U.S. Attorney